IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **LIBERTY NATIONAL BANK,** : | |
| : | Case No. 15-CV-549 |
| **Plaintiff,** : | |
| : | JUDGE ALGENON L. MARBLEY |
| v. : | |
| : | Magistrate Judge Deavers |
| **TRI-COUNTY COMMUNITY ACTION** : | |
| **COMMISSION FOR CHAMPAIGN,** : | |
| **LOGAN, AND SHELBY** : | |
| **COUNTIES,** *et al.*, : | |
| : | |
| **Defendants.** : | |

## OPINION AND ORDER

Before the Court are Defendant United States of America, Department of Transportation, Federal Transit Administration's ("FTA") Motion to Dismiss for Failure to State a Claim as to Counts 1, 2, and 4 of Plaintiff's Complaint (Doc. 18), and Defendant Ohio Department of Transportation's ("ODOT," with FTA, "Defendants") Motion to do the same (Doc. 24). The Motions are briefed and ripe for review. For the reasons below, both are **GRANTED**.

### I. BACKGROUND

#### A. Factual Background

On February 17, 2009, President Obama signed into law the American Recovery and Reinvestment Act ("ARRA"), which is administered in part by FTA. Pub. Law 111-5, Tit. XII, available at https://www.gpo.gov/fdsys/pkg/PLAW-111publ5/pdf/PLAW-111publ5.pdf (last accessed Mar. 10, 2016). The Act set aside federal funds to invest in transportation, environmental protection, and other infrastructure to provide long-term economic benefits. *Id.*, Sec. 3. In order to administer and manage funds, FTA uses a Master Agreement that governs the administration of federally funded projects. (Doc. 18 at 3.) According to the Master Agreement,

1

"Recipients" receive grants directly from FTA, and "Subrecipients" receive those grants through Recipients, one of which is ODOT. (*Id.*) Recipients are responsible for ensuring compliance with all applicable federal laws and regulations under grant agreements and the Master Agreement. (*Id.*) Under the Master Agreement, "the [federal government] "retains a [federal] interest in any real property . . . financed with Federal assistance . . . until . . . the Federal Government relinquishes its Federal interest in that . . . property." (*Id.* at 4.) Recipients must not encumber the property or do anything that would affect the continuing federal interest in the property without the express consent of the federal government. (*Id.*) Section 42 of the Master Agreement requires Recipients in the Nonurbanized Area Formula Program (such as ODOT) to enter into a written agreement with each Subrecipient setting forth the Subrecipient's responsibilities, including appropriate clauses "imposing requirements necessary to assure that the Subrecipient will not compromise the Recipient's compliance with the Federal requirements applicable to the Project and the Recipient's obligations under its Grant Agreement for the Project" and the Master Agreement. (*Id.*)

During fiscal year 2009, FTA awarded ODOT a grant with appropriations from ARRA. (*Id.* at 5.) The Grant designated $300,000 to purchase real property located at 315 Auburn Avenue West in the City of Bellefontaine in Logan County, Ohio (the "Property"). (*Id.*) In June of 2010, ODOT entered into a written agreement (the "Grant Contract") with Tri-County Community Action Commission for Champaign, Logan, and Shelby Counties ("Tri-County") to provide capital financial assistance to purchase land for public transportation service (the "Project"). (*Id.*) The parties entered into the Grant Contract in compliance with the Master Agreement, and Tri-County purchased the Property for approximately $305,876.00 in accordance with the terms of the Grant Contract. (*Id.* at 5, 7.)

In exchange for receiving Federal funds, Tri-County agreed to comply fully with "all federal, state, and local laws, rules, ordinances, executive orders, and other legal requirements as they apply to Public Transportation Systems and Transit Service." (*Id.*) Tri-County also agreed that the FTA Master Agreement was incorporated by reference in accordance with Federal law, and that any instrument to be used to convey a seller's rights, titles, and interest to purchasers must include this divestiture language:

> If the Grantee herein should cease or otherwise fail to use the premises herein conveyed for and in connection with a Transit Service, as defined in Article I, Section 1.41 of a certain Grant Contract entered into by and between Grantee and the Ohio Department of Transportation, Office of Transit . . . then the Grantee herein shall be divested of any and all rights, titles, and interests hereby conveyed to it and the same shall forthwith devolve upon and become the exclusive property of the Federal Transit Administration. . ."

(*Id.* at 5-6.) The only way to terminate FTA's interest in the Property in the event Tri-County ceased using it in connection with transit service was for Tri-County to pay FTA the then-current fair market value of the Property. (*Id.* at 6.) Along with those restrictions, Tri-County agreed to provide ODOT with reports in connection with the Project and to allow ODOT, the United States Department of Transportation, and other entities to audit and examine its records. (*Id.*) Tri-County was also required to keep records pertaining to the Project for at least three years after all matters concerning the Project were closed. (*Id.*) Finally, the Grant Contract specifically prohibited Tri-County from executing any mortgage, lien, assignment, or other legal or equitable claim against the Property unless authorized by the Administrator of ODOT's Office of Transit. (*Id.*)

Nevertheless, Defendants Denise Birt and Robert J. Notestine,[1] purporting to act on behalf of Tri-County, executed Notes totaling $300,026 with Plaintiff Liberty National Bank ("Liberty" or "Plaintiff") on October 30 and December 5 of 2012, and an Open-End Mortgage on

---

[1] These are Defendants only as to the third count of the Complaint, Negligent Misrepresentation.

the Property on October 30, 2012. (Compl., Doc. 1, ¶¶ 13-15, 56.) Plaintiff was not aware of FTA's claimed interest in the Property at that time. (*Id.*, ¶ 47.) When Plaintiff recorded the Mortgage, the Deed did not contain the required divestiture language. (*Id.*, ¶ 36.)

Tri-County later defaulted on the Mortgage, (*Id.*, ¶ 16), and on August 6, 2014, Plaintiff was awarded a judgment against Tri-County totaling approximately $244,000, together with interest, attorneys' fees and costs, in the Logan County Court of Common Pleas (Case No. CV-14-080257). (*Id.*) The judgment remained unpaid when this case was filed. (*Id.*, ¶ 17.)

### B. Procedural History

Plaintiff brought a foreclosure action on the Property in the Logan County Court of Common Pleas (the "Foreclosure Action") (Case No. CV14-09-0294). (*Id.*, ¶ 19.) On October 21, 2014, FTA filed a Notice of Removal of the Foreclosure Action to this Court (the "Federal Action") (Case No. 14-CV-2016). (*Id.*, ¶ 20.) FTA then filed a motion to dismiss in the Federal Action contending that the Court did not have jurisdiction to hear the Federal Action, and that Plaintiff failed to state a claim for foreclosure of the Property as it related to FTA or judicial attachment of federal property. (*Id.*, ¶ 21.) The Federal Action was later dismissed without prejudice by agreement of the parties. (*Id.*, ¶ 23.)

On February 6, 2015, Plaintiff filed its Complaint in the case *sub judice*. (*Id.* at 1.) Count One is brought under 28 U.S.C. § 2409(a), which provides that "[t]he United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights." (*Id.* at 9.) Count Two is brought under 28 U.S.C. § 2410(a)(1), which provides that "the United States may be named a party in any civil action or suit in any district court . . . to quiet title to real or personal property on which the United States has or claims a mortgage or other

4

lien." (*Id.* at 10.) Finally, Count Four is brought under 28 U.S.C. § 2410(a)(2), which provides that "the United States may be named a party in any civil action or suit in any district court . . . to foreclose a mortgage or other lien upon . . . real or personal property on which the United States has or claims a mortgage or other lien." (*Id.* at 12.)

On April 9, 2015, FTA filed a motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss the case for Plaintiff's failure to state a claim upon which relief can be granted (Doc. 18). On April 20, 2015, ODOT did the same, reiterating and incorporating FTA's arguments in their entirety. (Doc. 24).

## II. STANDARD OF REVIEW

The Court may dismiss a cause of action under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005). Thus, the Court must construe the complaint in the light most favorable to the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). The Court is not required, however, to accept as true mere legal conclusions unsupported by factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The allegations need not be detailed but must "give the defendant fair notice of what the claim is, and the grounds upon which it rests." *Nader v. Blackwell*, 545 F.3d 459, 470 (6th Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). In short, a complaint's factual allegations "must be enough to raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and it must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

Additionally, even if Plaintiff sufficiently states a claim for relief the Court will grant the motion to dismiss if "the undisputed facts conclusively establish an affirmative defense as a matter of law." *Hensley Mfg. v. ProPride, Inc.*, 579 F. 3d 603, 613 (6th Cir. 2009) (citing *In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 16 (1st Cir. 2003) (supporting dismissal due to an affirmative defense only when "the facts that establish the defense" are "definitively ascertainable from the allegations of the complaint," and when those facts "conclusively establish" the defense)).

### III. ANALYSIS

#### A. Federalism

Defendants argue that the national scope of ARRA prevents Plaintiff from attaching federal property. (Doc. 18 at 10.) They further argue that Tri-County could not, and thus did not, legitimately grant a mortgage on an interest in the Property greater than it owned. (*Id.* at 14-15.) Finally, in their Replies to Plaintiff's Response in Opposition to Defendants' Motions to Dismiss, Defendants argue that federal law preempts relevant Ohio law. (Doc. 47 at 2.) The Court will analyze these arguments *seriatim*.

#### 1. Preemption

Defendants argue in their Replies that Plaintiff's claims are preempted under the Supremacy Clause of the United States Constitution. *See State Farm Bank v. Reardon*, 539 F.3d 336, 341 (6th Cir. 2008). The Supremacy Clause provides that "the Laws of the United States" made in pursuance of the Constitution "shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." U.S. Const., art. VI. Federal law may preempt state law expressly or impliedly, meaning preemption "is compelled whether Congress' command is explicitly stated in

6

the statute's language or implicitly contained in its structure and purpose." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1982) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)).

Implied preemption is divided into two categories: field preemption, where federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)), and conflict preemption, where "compliance with both federal and state regulations is a physical impossibility," *id.* (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 873 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Preemption analysis is guided by two cornerstones. First is the purpose of Congress, which is "the ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted). Second is the presumption against preemption when Congress has "legislated . . . in a field which the States have traditionally occupied." *Id.* (quoting *Rice*, 331 U.S. at 230). Accordingly, courts "have a duty to accept the reading that disfavors preemption" because "the States are independent sovereigns in our federal system" and courts "have long presumed that Congress does not cavalierly preempt state-law causes of action." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (internal quotation marks omitted). Defendants provide no support for explicit preemption here, so the Court is then tasked with determining whether ARRA impliedly preempts it.

7

Defendants argue that there is a conflict between federal law and state law. (Doc. 47 at 7.) The Court is not persuaded by that argument. There are two kinds of conflict preemption. First is when compliance with federal and state law is a "*physical impossibility*." *Gade*, 505 U.S. at 98 (emphasis added). In this case, Plaintiff would not, and indeed could not, have legitimately brought this suit had the federal government recorded (or required another to record) its interest in the real property at issue. (Doc. 1, ¶¶36, 47, 53; Doc. 37 at 1.) And there is no evidence to suggest that the federal government could not have complied with both federal law and Ohio law. That sort of conflict preemption is therefore inapplicable.

The second type of conflict preemption is when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 873 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Defendants cite *City of New York v. F.C.C.*, 486 U.S. 57 (1988) as support for this proposition in error, as that case actually concerns explicit preemption ("Since the Commission has explicitly stated its intent to exercise exclusive authority in this area and to preempt state and local regulation, this case does not turn on whether there is an actual conflict between federal and state law"). *City of New York v. F.C.C.* at 65-66. Defendants correctly cite *Geier v. American Honda* and *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988) as standing for the proposition that a state law that frustrates the objectives of federal legislation renders that state law null, but the Court is not convinced that such frustration-of-purpose preemption is evident here, much less conclusively so. Indeed, complying with Ohio notice requirements might even *further* the interest of the federal program considering the fact that giving such notice (or requiring such notice be given) would have prevented the sort of litigation now being pursued.

8

As for field preemption, Defendants rely on one case to support their argument, which is ultimately unpersuasive. It is without question that property rights are ordinarily defined and governed by State law. *Sherwood v. Tenn. Valley Auth.*, 590 F. App'x 451, 461 (6th Cir. 2014) (citing *Columbia Gas Transmission Corp. v. Exclusive Natural Gas Storage Easement*, 962 F.2d 1192, 1198 (6th Cir.1992)). Quoting *Sherwood*, Defendants note that "when the United States is party to a lawsuit, and the underlying activities arise from a federal program, the federal interests implicated may warrant the protection of federal law." 590 F. App'x at 461 (citing, *inter alia*, *United States v. Lottle Lake Misere Land Co., Inc.*, 412 U.S. 580, 592-93 (1973), and *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366 (1943)). *Misere* quotes *Clearfield Trust* in its discussion of whether to apply federal or state law to the case, ultimately deciding to apply federal law because the "[t]he 'reasons which may make state law at times the appropriate federal rule are singularly inappropriate here.'" 412 U.S. at 595. In *Misere*, the state law at issue explicitly and retroactively abrogated the explicit terms defining the federal land acquisition, which was deemed "plainly hostile to the United States." 412 U.S. at 581-82, 597. In *Clearfield*, the application of state law was inappropriate because "[t]he application of state law . . . would subject the rights and duties of the United States to exceptional uncertainty." 318 U.S. at 367. The underlying concerns there, outright hostility and undue uncertainty, are not apparent here. As discussed above, application of Ohio law might actually further the interest of the federal program. Defendants' pre-emption arguments are unpersuasive and, therefore, fail.

2. <u>Validity of Conveyance</u>

Defendants argue that the mortgage on the Property obtained by Plaintiff from Tri-County is invalid and unenforceable, (Doc. 18 at 14), noting that Tri-County could not mortgage an interest greater than it had. On this issue, Ohio law is clear: a person may not grant a

9

mortgage on a property in which one has no interest, *In re Doubov*, 423 B.R. 505, 513 (Bankr. N.D. Ohio 2010) (citation omitted). Furthermore, "a mortgagee can take no greater title than that held by the mortgagor." *Id.* (quoting *In re Creter*, No. 06-13739, 2007 WL 2615214, at *4 (Bankr. N.D. Ohio Sept. 5, 2007) (quoting 69 Ohio Jur.3d *Mortgages and Deeds of Trust* § 17)). Thus, if Tri-County had no interest in the Property, it could not grant a mortgage on the Property to Plaintiff.

Although Defendants correctly characterize the law, their argument misses the point. Pointing out that Tri-County could not grant a mortgage on property in which it had no interest does nothing to help the Court determine whether Tri-County had a legitimate interest in the Property to grant a mortgage in the first place.

### 3. Attachment of Federal Funds

According to Defendants, the national scope of ARRA prevents Plaintiff from foreclosing on the Property. (Doc. 18 at 10.) They argue that established law forbids creditors from "swooping in and cashing in on assets purchased with federal funds." (*Id.*) To support this argument they rely on two Seventh Circuit cases and a district court case, all concerning federally funded property later sought by creditors in bankruptcy and other proceedings. (*Id.* at 10-14.)

First, in *Palmiter v. Action, Incorporated*, the court was tasked with determining whether someone in a post-judgment garnishment proceeding could attach the bank accounts of a nonprofit community service organization ("Action") funded almost exclusively by federal and state grants. 548 F. Supp. 1166, 1167 (N.D. Ind. 1982), *aff'd*, 733 F.2d 1244 (7th Cir. 1984). The court's answer depended on whether the funds belonged to Action or the government. *Id.* at 1168. If the funds belonged to Action, then they could be attached. *Id.* If they belonged to the

10

government, then they could not be attached absent a waiver of sovereign immunity. *Id.* Characterizing Action as "only one link in the bureaucratic chain necessary to move funds from the United States Treasury to local communities," *id.*, the court ultimately found that substantially all of the funds in the accounts were of federal origin and thus belonged to the federal government and could not be attached absent a waiver of sovereign immunity. *Id.* at 1171-72.

In *In re Joliet-Will*, the Joliet-Will County Community Action Agency ("Joliet-Will"), a private nonprofit community service organization financed exclusively by federal and state grants, filed for bankruptcy under Chapter 7 of the Bankruptcy Code. 847 F.2d 430, 431 (7th Cir. 1988). As in *Action*, the question presented was "whether the cash, and the personal property purchased with governmental grant money, are assets of Joliet-Will . . . or whether they are assets of the federal government and of the state agencies to which the federal government made some of the grants initially." *Id.* at 432. If they were the former, then the property was within the power of the bankruptcy trustee. *Id.* If they were the latter, then it was not. *Id.* After examining whether the grants' terms rendered Joliet-Will an intermediary lacking beneficial title or whether the terms made the grants more like payment for promised performance, the court determined that the government-provided funds were not part of the bankruptcy estate *Id.* At 432-33.

In *In re 28th Legislative District Community Development Corporation*, the court examined whether the real property owned by a nonprofit community organization ("28th Legislative District") would be available to creditors in its bankruptcy. No. 10-14804, 2011 WL 5509140 at *1, 6 (E.D. Tenn. Nov. 10, 2011). The court discussed the appropriateness of applying the *Joliet-Will* framework to a matter involving real property. *Id.* at *8, 9. The court

11

ultimately decided to apply *Joliet-Will*, finding the government property unavailable to creditors for the reasons expressed in *Joliet-Will*, discussed *supra*. *Id.* at *9.

Defendants urge the Court to adopt the *Joliet-Will* framework for the case *sub judice*, and they propose a three-part test to guide the analysis, which is to determine: (1) whether the grants imposed "minute controls on the use of the funds" affording the recipient "little discretion;" (2) whether the "nature of the grantor-grantee relationship" effectively positioned the grantee as "an agent to carry out specified tasks rather than a borrower, or an entrepreneur using invested funds;" and (3) whether the federal statute authorizing the program did not authorize the federal or state government "to allow appropriated funds to be used to pay creditors of a private institution unless the creditor incurred an expense specifically authorized by the grants and applicable regulations." (Doc. 18 at 11-12) (quoting *Joliet-Will*, 847 F.2d at 432).

Plaintiff urges the Court to find *Joliet-Will* inapplicable, (Doc. 37 at 14), suggesting that the Court instead adopt the stance taken by the bankruptcy court in *In re Premier Airways, Incorporated*, 303 B.R. 295 (Bankr. W.D.N.Y. 2003) (Doc. 37 at 14). There the court had to determine whether real property purchased with funds from a United States Department of Transportation grant with unrecorded conditions (including a condition disallowing the grant recipient from selling, mortgaging, or encumbering the property) could be properly included in the grant recipient's bankruptcy estate. *Premier*, 303 B.R. at 296. The court found the real property properly included in the estate. *Id.* at 299. Most pivotal to that court's decision was its determination that real property was different from personal property as reflected in the Bankruptcy Code. *Id.* at 295. The court found that the bankruptcy trustee who, without knowledge of either other claims or possible defects in title to the real property, enjoyed the rights and benefits of a bona fide purchaser, *id.* at 298, which is to say the trustee had an interest

12

superior to that of the federal government. *Id.* at 297. Defendants argue that *Premier* is not only inapplicable but also wrongly decided. (Defs.' Reply, Doc. 47 at 9.)

The Court will apply *Joliet-Will* to the case *sub judice*, joining the "number of cases hold[ing] that federal funds in the hands of a grantee remain the property of the federal government unless and until" spent according to the terms of the grant. 847 F.2d at 432. This is because "the funds of the government are specifically appropriated to certain national objects, and if such appropriations may be diverted and defeated by State process or otherwise, the functions of the government may be suspended." *Id.* at 432-33 (quoting *Buchanan v. Alexander*, 45 U.S. 20, 20 (1846) (forbidding creditors from garnishing the wages of seamen of the naval vessel Constitution)). *28th Legislative District* also quoted *Buchanan*, "[s]o long as money remains in the hands of a disbursing officer, it is as much the money of the United States as if it had not been drawn from the treasury. Until paid over by the agency of the government to the person entitled to it, the fund cannot, in any legal sense, be considered a part of his effects." 45 U.S. at 20–21.

Rather than the precise scheme Defendant describes, the Court finds the *Joliet-Will* framework better characterized as a holistic standard, the crux of which is the breadth of discretion enjoyed by the recipient of government funds. However characterized, the framework positions Tri-County squarely as an intermediary. Tri-County had little discretion over the use of funds, the relationship between the federal government and Tri-County charged Tri-County with carrying out specific tasks under federal law, and the Master Agreement provided for the federal government's retention of its interest in the property. (Doc. 18 at 12.) The Court is therefore persuaded that Tri-County would be characterized as a mere intermediary under the *Joliet-Will*

13

framework. As such, the Court finds that Defendant's argument prevails, and that Plaintiff may not attach the property.

The Court notes, however, that this litigation would be unnecessary if the government had simply provided notice, and that providing such notice has precedent. *See* 45 C.F.R. § 1309.21(d)(2) (requiring grantees of the Head Start Program to "record the Notice of Federal Interest in the appropriate official records for the jurisdiction where a facility is or will be located immediately upon"); 45 C.F.R. § 75.323 (stating that Department of Health and Human Services awarding agency "may require the non-Federal entity to record liens or other appropriate notices of record to indicate that personal or real property has been acquired or improved with a Federal award and that use and disposition conditions apply to the property"); 13 C.F.R. § 314.2 (providing that property acquired or improved with grants from the Department of Commerce, Economic Development Administration "is often reflected by a recorded lien, statement or other recordable instrument setting forth EDA's [p]roperty interest in a Project").

Nonetheless, because the Court finds that Plaintiff may not attach the Property, the Court **DISMISSES Counts 1** and **4** of the Complaint.

### B. Nature of Government Interest

Defendants argue that the federal government never had a mortgage or lien on the Property under 28 U.S.C. § 2410. Defendants refer only to Count Two with this argument, but it also implicates Count Four. If the federal government does not have a mortgage or lien on the Property, then Counts Two and Four both must fail. Count Two is brought under 28 U.S.C. § 2410(a)(1), which provides that "the United States may be named a party in any civil action or suit in any district court . . . to quiet title to real or personal property on which the United States has or claims a mortgage or other lien." (Doc. 1 at 10.) Count Four is brought under 28 U.S.C. §

2410(a)(2), which provides that "the United States may be named a party in any civil action or suit in any district court . . . to foreclose a mortgage or other lien upon . . . real or personal property on which the United States has or claims a mortgage or other lien." (*Id.* at 12.)

If the federal government has neither a mortgage nor a lien on the Property then Plaintiff cannot bring suit under any subsection of 28 U.S.C. § 2410. *See Stewart v. U.S.*, 242 F.2d 49, 53 n.2 (5th Cir. 1957). Black's Law Dictionary defines the term lien as "[a] legal right or interest that a creditor has in another's property, lasting usu. until a debt or duty that it secures is satisfied." "Lien," Black's Law Dictionary (10th ed. 2014). In any case, whether the federal government's interest in the property amounts to a mortgage or a lien is ultimately irrelevant. No party is arguing that the federal government has a mortgage interest, and Plaintiff included Count Two in the Complaint only "in the event the FTA claimed that the federal government had a lien or equitable lien on the Property." According to Plaintiff, "if FTA is not claiming the federal government has a lien or equitable lien on the Property, Count [Two] should be dismissed." (Doc. 37 at 18.) The federal government is claiming as much, and the Complaint and the briefings indicate that the relationship between FTA, ODOT and Tri-County was unrelated to security for payment of debt or other obligation and, thus, not a lien. **Count Two** is therefore **dismissed**.

### III. CONCLUSION

For the reasons above, Defendants' Motions to Dismiss are **GRANTED**. This case is **DISMISSED with prejudice** as to Defendants Federal Transit Administration and Ohio Department of Transportation.

    **IT IS SO ORDERED.**

                                         s/Algenon L. Marbley

                                        **ALGENON L. MARBLEY**
                                        **UNITED STATES DISTRICT COURT**

**Dated: March 24, 2015**